Howell and Adams *vs.* Lee.

---

THOMAS W. HOWELL and FARLEY B. ADAMS, plaintiffs in error, *vs.* JOSEPH A. L. LEE, defendant in error.

NOTE. WARNER, C. J. did not preside in this case.

It is the well settled rule of the Supreme Court not to reverse a refusal to dissolve an injunction, upon the coming in of the answers of the defendants, unless it is made clearly to appear that the discretion of the court was improperly exercised in retaining the injunction.

Motion to dissolve injunction. Decided by Judge WORRILL. Superior Court of Muscogee County. November Term, 1866.

Farley B. Adams brought an action of ejectment, returnable to the November Term, 1858, of said Court, on the several demises of Thomas W. Howell and Farley B. Adams, against the defendant in error as tenant in possession, for the

recovery of lot number two hundred and sixty and all of lot number two hundred and fifty, (except ninety-two acres on the east side of it) in the tenth district of said county, and for mesne profits.

On the trial before the petit jury, said plaintiff introduced in evidence, a deed for the said premises from William B. Tinsley, (dated prior to the deed to defendant in error, hereinafter mentioned,) to Thomas W. Howell, and a deed from Howell to said plaintiff Adams. The defenses, of fraud and combination between Howell and Adams hereafter set forth, failed, and the plaintiff in ejectment recovered the premises in dispute and ——— dollars for mesne profits. Thereupon the defendant Lee appealed.

Lee then filed this bill, praying discovery, the cancellation of said deed from Tinsley to Howell, and injunction against said action of ejectment.

In said bill Lee alleged that on 16th February, 1856, he purchased said land from William B. Tinsley aforesaid, then of said county, but now of Russell County, Alabama, who was then and for many years before had been, in possession of it, claiming and holding title to the same, for which he then and there paid said Tinsley the price agreed on between them. As an exhibit, he attached to his bill a deed made in said County of Muscogee, of that date, for said land from Tinsley to himself. The consideration expressed in said deed is $1,000.00. It purports to have been executed in presence of J. J. Rockmore and B. H. Davis, and afterwards, to-wit, on the 21st July, 1856, probated by Rockmore before "F. B. Adams, J. P." in said county. It was in the usual form of fee simple warranty deeds.

Complainant alleges that he immediately took possession of said land, and has held it as his own ever since under said deed. He recites the facts of the ejectment case aforesaid. He further states that the deed from Howell to Adams was made and dated long after his said purchase, and during his possession of the same, and by a combination between Howell and Adams to defraud him; that Tinsley was and had been for several years in possession of said land and certain slaves and

other personalty, claiming them as his own; that Tinsley was a weak-minded man, ignorant, easily duped and imposed upon by any one whom he counted as his friend; that Howell was the executor of Tinsley's father, and possessed Tinsley's confidence; that Howell or said Adams, or others at his or their instigation, as he was informed, induced Tinsley to believe that a warrant had been issued or was about to be issued against him for a crime, the punishment for which would be imprisonment in the penitentiary, and his property would be sacrificed; that thus was he so alarmed that he hid himself for several days, and at a fit time for the purpose, Howell came and represented to him that the only way for him to save his property, was to convey it to Howell, taking Howell's notes therefor, then Howell would settle the difficulty and re-convey to him the property; that Tinsley under said fear, made the conveyance of the said land and of all his personalty, even down to the chickens in his yard, and took therefor Howell's note for $6,000.00, due twenty-one years after date, and induced Tinsley to believe that to guard and protect said property, it was necessary that he, Howell, should move upon the land.

Complainant avers that thus Howell took possession, when there was no such warrant, but only a report circulated by Howell for said purpose; that some of complainant's friends having learned the facts, became indignant and declared their purpose to protect him; and thereupon said Howell, having been in possession only a few days, took back his notes from Tinsley, induced Tinsley to believe he would deliver or destroy said deed, and moved off the land back to his home; that Tinsley remained in possession during said time; that complainant purchased of Tinsley without knowledge of any claim of any kind by Howell; that Howell knew of his purchase and lived neighbor to him for several years, and made no claim to said land within complainant's recollection. It is alleged that Howell was insolvent; said Adams knew said insolvency; he knew Tinsley was weak-minded as aforesaid; he was the justice of the peace who witnessed the deed; he was cognizant of the fraud by Howell from the beginning;

he knew Tinsley was alarmed, and he was told or otherwise learned at the time of making said deed and afterwards, that it was a sham, or to cover this property from a danger which did not exist; he knew that only said note was the consideration; he knew that Tinsley had never been out of possession of the land, but lived on it till complainant bought him out, and then gave to complainant actual possession; he knew all the facts and circumstances of said trade by Howell and Tinsley; that Tinsley sued for the only negro which Howell took away, and Howell settled the case; and yet knowing that Howell was about to leave the State, and being his intimate friend, for no consideration or a nominal one, he procured said deed from said Howell to said land; this was done after said Adams had tried to sell to complainant Howell's claim, and after complainant had told him distinctly that Howell's claim was fraudulent and he would pay nothing for it.

The bill was sanctioned and injunction issued. Adams was served, Howell not found. Adams filed his answer. In it he answers that Tinsley was in possession of said land up to 1st June, 1853, claiming it as his own; about this time, as he is informed, Tinsley moved off the land and Howell moved into the dwelling house and took possession of said land, claiming it as his own. Subsequently Howell moved off and Tinsley again took possession, as he is informed and believes, under the agreement made at the time of said conveyance by Tinsley to Howell, which agreement allowed Tinsley to live' there but not as the owner. Complainant's purchase as stated, is admitted. It is averred that the consideration of said deed was land in the up-country which cost complainant about four hundred dollars; that one Anderson was then in possession, Lee succeeded him, and some free negroes succeeded Lee as his tenants. The recitals of the action of ejectment are admitted. The deed from Tinsley to Howell was dated 1st June, 1853, and recorded 4th July, 1853; and the deed from Howell to Adams was dated in 1858, after complainant's purchase. He answers that "Tinsley is not a man of first-rate education; he can read and write, and when compared with some men, would be considered a man of small acquirements;

he was not, at the time of the trade with Howell, a weak-minded man, and in the management of property and money and in trading, showed considerable shrewdness, and could not be usually duped or imposed upon by any one;" Howell was Tinsley's intimate friend and his father's executor, but whether Howell had his confidence, he has not knowledge or belief. He denies that he ever did in any way frighten said Tinsley by the matters charged, as to the warrant etc., and does not believe that Howell did, or that Tinsley made the deed under such influence or circumstances as charged, or under a promise by Howell to re-convey to him. It is admitted that the purchase was of the comprehensive character described, and was, as he is informed and believes, in consideration of two hundred dollars cash and Howell's twelve notes for five hundred dollars, one to be due each year for twelve years after said trade, and that Howell took possession of the negroes and other personalty, and was in exclusive possession of said land four or five weeks, not fraudulently but in good faith. He answers that during part of this time Tinsley had left the plantation and was staying with his sister; that he, respondent, was not present at the agreement, but he believes there was some arrangement and partial cancellation of said trade, but not as complainant alleged; he is informed and believes that the deed was not to be delivered up, but that Tinsley was to have back all the personalty except one negro, and to have the privilege of living on the land, and that complainant knew all this at the date of his purchase. He did offer to sell Howell's title to Lee at one time, but Lee said it had been offered to him before, and that he would not purchase said title. His deed was not without consideration, but he paid Howell some money, a mule and a debt of three or four hundred dollars which he held against Howell; this was not full value, but that was because it was burdened with the lien of a judgment against Howell for about five hundred dollars.

He denies any knowledge of any fraud or improper inducements for said deed; witnessed it as a justice without any suspicion of fraud; and denies that Howell surrendered the

negro sued for, but believes that the negro was sold and five hundred dollars paid to Tinsley, and three hundred to Howell on compromise. He admits Howell's insolvency; that he, when Howell was about to leave the State, tried to sell the title to Lee in order to collect a debt, and so told Lee; but did not offer to take one hundred dollars or other sum, but Lee said he would not give a damned dollar for Howell's title, and it was after this that he purchased from Howell.

The answer of Thomas W. Howell alleged that he went into possession of said land for a valuable consideration, and in good faith took possession, and after six or seven weeks, under a new trade, moved out and left Tinsley in possession, upon condition that Tinsley was to remain on the land and have the usufruct as long as he lived; and if Tinsley left it at any time he was to forfeit his said right; that he bought it with no intended fraud, but took it upon the terms stated in Adams' answer (which was Tinsley's own proposition), promising, in addition thereto, to furnish Tinsley with board, washing, mending, &c., which was to be in lieu of interest on said debt. About six or seven weeks after that, Tinsley bought back all the property, taking the land on the terms aforesaid.

He answered that before he moved into said land he gave a mortgage securing conditionally to Tinsley all of the property therein contained, which conditions were that if at any time he failed to pay his regular installments to Tinsley, the trade was to be of no effect, and he was to lose all past payments and forfeit possession of the property. Adams knew nothing of the trade till next morning, when Howell (and Wm. B. Weed for a witness) went to have the papers signed; then and there the papers were read over to Tinsley and to the said Weed and Adams, and Tinsley said he was satisfied with the trade and delivered the deed. Howell was then going to Columbus, and said he would get his deed recorded, and Tinsley wished him to take the mortgage and have it recorded also; and Howell declined, saying, You had better attend to that yourself. Upon Howell's return from Columbus, Tinsley was highly elated with his trade, saying, "Now,

by God, I will go where I please." Tinsley was not a weak
minded person, nor is he aware he was so considered in the
neighborhood, but a tolerably shrewd man, especially where
money was concerned. After the trade had been made and
the papers exchanged, he heard that there was a difficulty
between Adams and Tinsley, because Tinsley had sworn to a
lie, thereby involving Adams in a debt in which he was se-
curity ; that the first direct information he had of this was
by an offer of five hundred dollars to him by Tinsley if he
would effect a reconciliation between Adams and Tinsley; he
saw Adams, and Adams said if Tinsley would never speak to
him he would pass and repass with him. He is informed
and believes that Lee swapt lands in Fayette County with
one Larkin Tinsley for the lands in Muscogee; that about
the time Tinsley moved off, one James Anderson went into
possession under this arrangement. Anderson came to re-
spondent and said Lee wished to lease him the land for five
years, but that he knew Lee's title was defective, and that if
respondent would consent he would go on said lands and
build ; it was agreeable, and Anderson went into possession
as respondent's tenant. Subsequently, some free negroes
went into possession, who are believed to be tenants of Lee.

Afterwards respondent was about to go West, was in debt
to Adams and others, and proposed to sell to him because
Adams was contiguous to it, and respondent supposed he
would purchase it for that reason. Respondent told Adams
he would sell the land low, as he was in debt to him, and
would take a mule or a horse if he would pay two executions
which were against him. Adams said he would see com-
plainant and offer him the land, and he believes he did, and
that complainant said "he would not give a d—d dollar for
Howell's title !" Respondent was nearly a year trying to
effect a trade with Adams, and was meanwhile informed that
Lee said that respondent was so poor that he could not enter a
suit for the land, and he would hold it by Statute of Limita-
tions. Respondent says he made the deed to Adams for a
consideration satisfactory to himself. Respondent says that
"there was no warrant or other process of law held before

Tinsley to terrify him or otherwise force him to sell said property, (and denies all fraud and fraudulent combination with Adams or others,) that all Adams ever said to respondent about Lee's false swearing, was several days before the trade made with this respondent, and all he then said was, that he had a good will to cut Tinsley's throat for the lie; that a short time before Tinsley moved away, respondent came home from Court Saturday evening, and found Tinsley locked up in the smoke-house and pretending to be very much excited, and upon inquiry Tinsley told this respondent that he was secreting himself because one Rich, to whom Tinsley owed seventy dollars, had been there for his money, and upon learning that Tinsley had sold all his property, threatened to levy an attachment on one or two little mulatto negroes which he had not sold to respondent, although they were at his house. Shortly afterwards respondent told Rich he would pay the debt; Rich was satisfied; and then Tinsley paid Rich. This was the cause of Tinsley's leaving the plantation and staying with his sister, who afterwards bought these little negroes. He charges that he believes that Lee took with knowledge of his deed, and upon the idea that he was too poor to assert his rights by law.

Respondent says Lee caused a *fi. fa.* for $41.00 to be levied on the land, and somebody paid it off, and that Tinsley admitted in his lifetime to James M. Henry and Joseph Henry that it was respondent's land, he having the right to occupy till he died.

Respondent admits that trover was brought for the negro, but denies that there was any compromise, but says he sold the negro to one Gallup for a valuable consideration, and Gallup effected some arrangement with Tinsley whereby the action was stopped; he admits the cancellation of the trade except as to one negro, and that the deed was to be kept by him, with privilege to Tinsley to occupy as aforesaid. Tinsley some time after moved to Columbus. No one was present at this cancellation but some of respondent's family, and Adams knew nothing of it till the business was finally arranged, the papers destroyed, and respondent ready to

move away ; and Adams always expressed great repugnance to trading for the land, but yielded to this respondent's solicitations in that regard.   Respondent denies that he got only a nominal consideration ; he got a price satisfactory to him and a release from a considerable indebtedness to Adams, with a prospect of paying other liabilities, and also got a mule and some cash, amounting in all to $600.00.   He admits the land was worth more, but that was all he could get at the time.   No one but Adams ever offered the land to Lee with respondent's knowledge or consent; he heard that others had, but he believed it was in bad faith, to injure respondent's title.   Adams made his offer without respondent's knowledge or consent, but afterwards told him of it and of Lee's reply, and said he would buy it and bring an action of ejectment for it, and did buy it as aforesaid.

Upon these answers the motion to dissolve was predicated. The Court refused to dissolve the injunction, and of this decision the plaintiff in error complains.

WM. DOUGHERTY, M. L. PATTERSON, represented by N. J. HAMMOND, solicitors for plaintiff in error.

WILEY WILLIAMS, solicitor for defendant in error.

HARRIS, J.

Notwithstanding the repeated decisions, from the very establishment of the Court itself, it seems very difficult to eradicate a prevalent but mistaken idea with members of the bar, that upon the coming in of the answer of a defendant, and swearing off (as it is called in common parlance,) the equity of complainant's bill, the injunction in the cause will, as a matter of course, be dissolved.   The granting and the dissolution of injunctions must ever remain matters for the careful and sound discretion of the Judges of the Superior Courts.   Injunctions are the most efficient instruments known to jurisprudence with which to enforce right and to protect against present or prospective wrong.

This Court is always reluctant to interfere, by ordering a dissolution, when the Judge below has refused such motion.

It will interfere whenever it is manifest to it that the discretion was abused or unsoundly exercised. We do not think the refusal here calls for a reversal.

Judgment affirmed.